Walter BLEVINS et al *v.* George WAGNON et ux

83-220                                    664 S.W.2d 198

Supreme Court of Arkansas
Opinion delivered January 30, 1984
[Rehearing denied March 5, 1984.]

*Shackleford, Shackleford & Phillips, P.A.* and *House, Jewell, Dillon, Dover & Dixon, P.A.*, by: *Mark W. Nichols,* for appellant.

*Gibson Law Office,* by: *Charles S. Gibson,* for appellant.

DARRELL HICKMAN, Justice. This is the second appeal of this case. In the first appeal, we decided, in an unpublished opinion, that appellees George and Sue Wagnon had an unqualified option to purchase the land and facilities which were used as a nursing home in Warren, Arkansas.[1] After our

---

[1] *Wagnon v. Blevins,* No. 77-233, March 6, 1978.

decision, the Wagnons and Blevinses disagreed on what the purchase price would be under the option. Another suit was filed. After trial the chancellor decided the appraisal performed by a third appraiser, selected by agreement, would be the purchase price.

The appellants are Walter and Ila Blevins and their son and daughter-in-law. They make several arguments for reversal, and the corporation that the Blevinses and Wagnons formed, the Autumn Hills Nursing Center, Inc., has also appealed, alleging Sue Wagnon violated her fiduciary duty to the corporation. The Wagnons filed a cross-appeal arguing the chancellor should have awarded them damages because the appellants delayed the purchase of the property.

The chancellor, who was charged with the duty of deciding the credibility of the witnesses, weighing the evidence and balancing the equities, made his decision. We can only overturn that decision if he was clearly wrong in a resolution of a factual dispute, or wrong as a matter of law. A.R.C.P. Rule 52. We find he was neither and affirm the decree.

To completely understand our decision, the facts must be discussed in detail. Sue Wagnon, one of the appellees, decided to build a nursing home. For two and one-half years she did what was necessary to obtain permits required for licensing and a certificate of need, which is the allowance to have a certain number of beds — in this case, 105. Permits were granted. She found real estate, obtained an option to purchase the land and had architectural plans drawn up. Walter and Jerry Blevins, two of the appellants, doing business as Blevins and Blevins, were to be the contractors.

Mrs. Wagnon was unable to get financing so the Blevinses agreed to build the facility, finance the building, and purchase the real estate. The Blevinses spent approximately $475,000 in doing so. The Wagnons and Blevinses signed a memorandum agreement, which was not dated, but was entered into in 1976. It granted an option to the Wagnons to purchase and reads in pertinent part:

. . .[S]aid property . . . shall be subject to an Option to Purchase by Mr. and Mrs. George Wagnon which can be exercised after five years of operation of the nursing home for the appraised value of the property and facilities as mutually established by two competent and qualified appraisers, one being selected by each party. In the event that the two appraisers are unable to agree upon a single price for the facility, then the two appraisers shall agree upon a third appraiser who shall make the final determination as to the value to be assessed for purposes of this option.

According to the agreement the equipping of the facility was to be by the corporation formed by the parties. The agreement said that the members of the corporation would enter into a standard buy/sell agreement which would favor the stockholders. The buy/sell agreement was never executed; however, both parties testified that they felt bound by the buy/sell restrictions in the memorandum agreement. Each couple Walter and Ila Blevins, Jerry and Barbara Blevins, and George and Sue Wagnon, would own one-third of the stock. The nursing home began operation March 22, 1976. Sue Wagnon was director of nurses. Shortly after that, a lease agreement was entered into between the Blevinses and Autumn Hills Nursing Center, Inc. This lease agreement was executed on May 12, 1976, its term began on March 22, continuing for 15 years. The rent was $7,350 per month. The lease also provided tht "[I]n the event of a change in ownership of the corporate stock in the lease corporation affecting more than 10% of the outstanding and issued shares, Lessor shall have the option to terminate this lease, or re-negotiate any of its terms."

Walter Blevins signed the agreement as the lessee, Autumn Hills Nursing Center, Inc., and signed again along with Jerry Blevins, as the lessor. Sue Wagnon refused to sign it because it did not recognize her option. She resigned her position as head of nurses on May 28, 1976. That same month she asserted her option which the Blevinses refused to recognize existed anymore. They contended that she abandoned the option by resigning, along with other acts. Sue Wagnon sued and that brought the first appeal. On

remand, the parties were to determine the price by appraisal, the Blevinses to select one appraiser and the Wagnons to select an appraiser. If the parties could not agree, a third appraiser was to be selected.

The Wagnons got an appraisal for $688,750-$717,700, which included the land and facility, but not the value of an ongoing nursing home business. Their appraisal also considered that the property was encumbered by a lease. The Blevinses' appraisal did not consider the lease and was for $898,000. The parties sought a third appraisal. The first two appraisers agreed that James Scott would conduct the third appraisal. Scott contacted both appraisers and both legal counsel for the parties. Counsel for both parties signed a letter which set out the instructions for the third appraisal. The letter provided that the appraisal would be on the property and facilities and take into consideration the lease held by the corporation. Counsel for the Blevinses added in writing, "[plus] additional rent as per the lease." Scott's appraisal was for $700,000.

Meanwhile, as the time neared for the exercise of the option, Sue Wagnon contacted Beverly Enterprises who operated another nursing home in Warren where she had been working. She first talked to them about backing her financially in November, 1980. Beverly agreed to guarantee her a loan of $335,000 and Mrs. Wagnon had a bank agree to assume the first mortgage on the property.

In the agreement with Beverly, Mrs. Wagnon contracted to do what she could to break the lease that encumbered the property. Beverly agreed to pay the Wagnons $1,207,000. The Wagnons gave the Blevinses notice that they intended to tender $700,000 and to eventually try to terminate the lease. The Blevinses refused the tender and this suit resulted.

The central issue below was whether the property should have been appraised with the lease. As recited above, both attorneys agreed to the instructions. The Blevinses insisted, however, that their lawyer never agreed that the letter would be the final instruction; rather, their attorney felt that it would only be one of two ways to appraise the

property, as indicated in previous conversations. The attorney so testified. The chancellor resolved this factual dispute and found that the third appraisal, as made, was what the parties agreed on and that it was binding. Whether the property should have been appraised with the lease depends upon the intent of the parties and the documents. The chancellor resolved the conflict in the Wagnons' favor, and we find no reversible error.

The corporation filed an appeal arguing that Sue Wagnon was guilty of a breach of her fiduciary relationship with the corporation in negotiating with Beverly Enterprises and trying to terminate the lease. She and her husband own one-third of the shares in the corporation and Mr. Wagnon is a director. The Blevinses drafted the lease agreement that allows the lessor to break the lease upon a transfer of ten percent or more of the stock. The Blevinses drafted the agreement knowing that the Wagnons could one day be the lessors who would benefit from the provision. Obviously, the chancellor found that what was fair for the Blevinses would be fair for the Wagnons. We cannot disagree with that finding under these facts.

With regard to the Wagnons' cross-appeal, the chancellor found no facts justifying money damages for delayed performance. We find no error.

Affirmed.